UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAT DORRANCE,

    Plaintiff,             Hon. Paul L. Maloney

v.                   Case No. 1:13-CV-643

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

    This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C.

§ 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim

for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and

XVI of the Social Security Act.  Section 405(g) limits the Court to a review of the administrative

record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall

be conclusive.  Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to

submit proposed findings of fact and recommendations for disposition of social security appeals, the

undersigned recommends that the Commissioner's decision be **affirmed**.

1

**STANDARD OF REVIEW**

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## **PROCEDURAL POSTURE**

Plaintiff was 42 years of age on her alleged disability onset date. (Tr. 214). She successfully completed high school and worked previously as a customer service sales person and administrative assistant. (Tr. 32, 47). Plaintiff applied for benefits on June 30, 2010, alleging that she had been disabled since March 5, 2005, due to lupus, arthritis, reflex dystrophy syndrome, spinal bone deterioration, irritable bowel syndrome, and carpal tunnel syndrome. (Tr. 214-19, 262). Plaintiff's applications were denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 92-212). On March 7, 2012, Plaintiff appeared before ALJ James Prothro with testimony being offered by Plaintiff and a vocational expert. (Tr. 41-91). In a written decision dated April 27, 2012, the ALJ determined that Plaintiff was not disabled. (Tr. 23-35). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 1-7). Plaintiff subsequently initiated this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

Plaintiff's insured status expired on September 30, 2010. (Tr. 25). Accordingly, to be eligible for Disability Insurance Benefits under Title II of the Social Security Act, Plaintiff must establish that she became disabled prior to the expiration of her insured status. *See* 42 U.S.C. § 423; *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

## RELEVANT MEDICAL HISTORY

On March 15, 2005, Plaintiff was examined by Dr. Mir Ali.  (Tr. 518).  Plaintiff reported she was experiencing fibromyalgia, arthritis of the knees, hip and back pain, and carpal tunnel syndrome.  (Tr. 518).  An examination revealed the following:

> BACK: Examination of the lumbosacral spine tender to palpation in the paralumbar sacral area with restricted range of motion in the spine.

> EXTREMITIES: Examination of knees, stable knee joints bilaterally, nontender to palpation, anterior drawer sign is negative.  Examination of the hip joints, normal range of motion, nontender.  Straight-leg raising test is negative.  Examination of the shoulder joints restricted range of motion.  Examination of wrist joints, restricted range of motion, decreased motor strength in bilateral hands.

(Tr. 518).

On April 14, 2005, Plaintiff returned to Dr. Ali requesting a refill of her pain medication.  (Tr. 516).  A physical examination revealed the following:

> BACK: She is tender to palpation in the lumbosacral area.  She has restricted range of motion in the spine including flexion and lateral rotation.  She has restricted range of motion in the shoulder joints. The patient also has tenderness in the shoulder joint area bilaterally. She has restricted range of motion in the hip joints and in the knee joints.  She is nontender to palpation in knees and hips.  Straight leg raising test was negative.  No joint instability was noted in the knees, hips or elbow joints.

(Tr. 516).

Treatment notes dated October 6, 2005 indicate that Plaintiff was experiencing "chronic pain syndrome due to questionable fibromyalgia, arthritis, carpal tunnel syndrome." (Tr. 508).  The doctor also "suspect[ed] some degree of somatization disorder as well" and further noted that Plaintiff was engaging in "chronic narcotic medication use."  (Tr. 508).

4

X-rays of Plaintiff's cervical spine, taken October 11, 2005, revealed "very minimal narrowing of the C4-5 disc space," but "no significant osteophyte formation...no malalignment...[and] no other abnormality." (Tr. 506).

On October 11, 2005, Plaintiff was examined by Dr. Ali. (Tr. 501-02). With respect to Plaintiff's subjective complaints, the doctor reported the following:

> The patient states that she is no longer able to lift her hand or do any activity with her right hand. She is unable to lift any utensils with her right hand. She is unable to flex her elbow and she is unable to move her right shoulder. The patient has similar but less disabling complaints in her left upper extremity. The patient also has ongoing complaints of bilateral knee pain. The patient also has complaint of pain and discomfort in multiple other joints of the body. The patient thinks that the pain in her right upper extremity is due to worsening carpal tunnel syndrome. The patient stated that she underwent surgery on her right wrist for carpal tunnel syndrome in 2001 by Dr. Walton and surgery on her left wrist for carpal tunnel syndrome by Dr. Chess. She is requesting to see Dr. Chess again for possible recurrence of right wrist carpal tunnel syndrome. The patient is also requesting x-rays of her cervical spine to evaluate this pain in her shoulder.

(Tr. 501).

> A physical examination revealed the following:
>
> EXTREMITIES: The right upper extremity has restricted range of motion including flexion and extension in all 3 joints of the right upper extremity including wrist, elbow and shoulder joint. She has tenderness to palpation in all 3 joints. Phalen[1] and Tinel[2] tests are

---

[1] Phalen's test is performed to determine the presence of carpal tunnel syndrome. *See* Tinel's and Phalen's Tests, available at http://www.carpal-tunnel-symptoms.com/tinels-and-phalens-tests.html (last visited on August 25, 2014). Phalen's test is performed by bending the patient's wrists downwards as far as they will comfortably go and pushing the backs of the hands together. The patient should hold this position for one minute. A positive test is indicated by numbness or tingling along the median nerve distribution. *Id.*

[2] Tinel's test (or Tinel's sign) is performed to determine the presence of carpal tunnel syndrome. *See* Tinel's and Phalen's Tests, available at http://www.carpal-tunnel-symptoms.com/tinels-and-phalens-tests.html (last visited on August 25, 2014). Tinel's test is performed by tapping over the carpal tunnel area of the wrist with the palm up. A positive test causes tingling or paresthesia, and sometimes even a "shock type sensation," in the median nerve distribution. *Id.*

negative in the right wrist. Motor strength in the right upper
extremity is 3/5 to 4/5. The patient is experiencing pain on checking
motor strength, restricted range of motion in the shoulder joint and
painful range of motion. Sensory: Soft touch and pinprick
exaggerated pain sensations. Examination of the left upper extremity
shows motor strength of 4/5. Sensations are painful with soft touch
and pinprick. She has restricted range of motion in the wrist joint,
elbow joint and shoulder joint. Vascular supply in the bilateral upper
extremities is intact. Examination of the knee joints is nontender to
palpation bilaterally. She has full range of motion. Lachman's test[3]
is negative bilaterally. Vascular supply in the bilateral lower
extremities is intact.

(Tr. 501).

On November 2, 2005, Plaintiff was examined by Dr. Ali. (Tr. 499). A physical

examination revealed the following:

MUSCULOSKELETAL: Examination of joints shows elbow joints
nontender to palpation. Normal range of motion, including internal
rotation, external rotation and abduction and adduction of the
shoulder joint. Examination of the elbow joints shows them to be
nontender to palpation with full range of motion. Examination of
wrist joints shows restricted range of motion, including pronation and
supination and flexion/extension. Palmar grasp strength is 3/5
bilaterally. Reflexes are intact in the upper extremities. Knee joints
have normal range of motion, nontender. Hip joints are nontender.
Normal range of motion. Straight leg raising test is negative.

(Tr. 499).

On November 14, 2005, Plaintiff participated in an EMG examination the results of

which revealed "mild right carpal tunnel syndrome." (Tr. 496). On March 7, 2006, Plaintiff

participated in an MRI examination of her right elbow the results of which were "unremarkable."

(Tr. 357). An MRI examination of Plaintiff's right shoulder, performed the same day, revealed: (1)

---

[3]  Lachman's test assesses whether a patient has suffered a tear of the anterior cruciate ligament. *See*, *e.g.*, Physical
Examination of the Knee, available at, http://www.webmd.com/pain-management/knee-pain/physical-examination-of-the-knee (last
visited on August 25, 2014); Lachman's Test, available at http://www.fpnotebook.com/Ortho/Exam/LchmnTst.htm (last visited on
August 25, 2014).

tendinosis of the supraspinatus tendon without full thickness tendon tear or tendon retraction; and (2) joint spacing narrowing, bony spurring and inflammation of the acromioclavicular joint. (Tr. 358).

On March 14, 2006, Plaintiff was examined by Dr. Ali. (Tr. 539). The results of an examination were as follows:

> GENERAL EXAMINATION: Patient is not in acute distress. She is alert and awake. Heart is regular rate and rhythm with no murmur. Lungs are clear to auscultation bilaterally with no wheezes and no crackles.
> EXAMINATION OF BILATERAL UPPER EXTREMITIES: On inspection, mild muscle wasting is noted in arm and forearm bilaterally. There are no scars or deformities noted.
> RANGE-OF-MOTION: Passive range-of-motion is limited in the right upper extremity.
> MOTOR SYSTEM: There is 4 by 5 strength in the right upper extremity.
> PALPATION: There is diffuse tenderness to palpation in the right upper extremity. No point tenderness is elicited. There is restricted range-of-motion in the wrist, ankle, and shoulder joints.
> SENSORY SYSTEM: Patient is highly sensitive to touch in her right upper extremity diffusely.

(Tr. 539).

The doctor instructed Plaintiff to participate in physical therapy "with focus on developing a home program for stretching and strengthening exercises for the right upper extremity." (Tr. 540).

On March 29, 2006, Plaintiff was examined by Dr. Richard Swanson with Shoreline Rheumatology Services. (Tr. 529-31). Plaintiff reported that she was experiencing "increasing pain primarily in her right upper extremity." (Tr. 529). Plaintiff reported that "her whole arm is exquisitely painful both day and night and there is exquisite pain to gentle touching of the skin." (Tr. 529). The results of a physical examination revealed the following:

7

As I examined the patient, I noted that the blood pressure was 124/82. The height was 65 3/4 inches and the weight was 146 pounds. The pulse was 84 and was equal in both wrists. The examination of the hands showed no abnormalities per se of the fingers except for mild enlargement of the DIP joints compatible with osteoarthritis. The grip strength on the right was less than 100 mmHg and on the left was 200 mmHg. This is in a patient who supposedly is right hand dominant. The patient's range of motion was limited at the shoulder to approximately 90 degrees of abduction and severe pain throughout the entire area was elicited. A careful evaluation of the supraclavicular area showed no nodules. No bruits were heard over the supraclavicular area. The blood pressure was equal in both arms. The neck was supple. There was significant tenderness in the posterior strap muscles of the neck but there was no limitation.

The neurologic examination in the upper extremities showed there was hyperalgesia in the right upper extremity to light touch but the temperature was equal to the left. The deep tendon reflexes were present and equal in the biceps, triceps and brachial radialis bilaterally.

I carefully examined the patient otherwise and she did not have the usual and typical tender points above and below the diaphragm and I think the diagnosis of fibromyalgia has to be put aside for the moment. The patient does have elements of depression and depression itself can cause pain but whether she truly has "fibromyalgia" or Chronic Pain Amplification Syndrome is not clear.

The patient definitely has motor and sensory abnormalities of the right upper extremity. She does have pain in her neck and shoulders but range of motion is normal. I have been assured from her x-rays that her neck is normal. However, I am concerned that she does have reflex sympathetic dystrophy and I discussed this in detail with her and gave her some educational material.

As you know, there is no one very good therapy for this disorder. The use of corticosteroids has been tried in the past and I elected to place her on three week Prednisone trial. The use of stellate ganglion blocks has been quite useful but all of these have to be combined with physical modalities which I will discuss with the patient and make further recommendations to you when she returns in several weeks.

(Tr. 530).

8

On May 3, 2006, Plaintiff was again examined by Dr. Swanson. (Tr. 528). Following a physical examination, the doctor reported the following:

> Because of the diffuse dysesthetic pain in her right arm, I was concerned about the possiblity of reflex sympathetic dystrophy. However, there was no cutaneous evidence and there were no contractures of the arm. I also reviewed the patient's laboratory which was entirely normal with a C-reactive of .3 and a sedimentation rate of 1. The thyroid functions were normal and she had no evidence of diabetes either.
>
> She had indicated to me that she had a median nerve unroofed in the right arm a number of years ago and that symptoms had reoccurred and that with confirmation by electrodiagnostic studies. She initially had discussed this with her surgeon and he did not wish to proceed. She has ignored this now for several years. After careful study, I have to modify my natural diagnosis and indicate that I do not find any evidence to substantiate the diagnosis of reflex sympathetic dystrophy and believe that many of her symptoms relate to ongoing neuropathic processes in her arm. People typically think of numbness and tingling in the arm from a carpal tunnel syndrome but in fact it can cause retrograde pain all the way up the arm and in some cases can even present with a pseudoinflammatory arthritis.
>
> I discussed with Mrs. Dorrance these findings and suggestions and suggested that this needs to be approached from a neurologic and neurosurgical standpoint and that there was very little if any rheumatologic treatment necessary or available.

(Tr. 528).

On June 20, 2006, Plaintiff was examined by Dr. Ali. (Tr. 344-45). Plaintiff requested "a refill of her narcotic medications," but the doctor informed Plaintiff that "she had been dismissed from our clinic for violating the pain contract." (Tr. 344). Specifically, the doctor observed that Plaintiff had obtained Vicodin from a different clinic in violation of her pain contract. (Tr. 344). Plaintiff responded that it was the other doctor's "fault for prescribing her the Vicodin and not her fault for filling the script." (Tr.344). Plaintiff also reported that "the Duragesic and

9

Neurontin have been controlling her pain to a large extent." (Tr. 344).  Plaintiff was given "15 days of Duragesic patch and Neurontin for one month" and "told to get established with a new physician to address her pain issues." (Tr. 345).

On September 6, 2007, Plaintiff was examined by Dr. Bryan Visser.  (Tr. 368-70). Plaintiff reported that she was experiencing "chronic pain" which was "aggravated by leaning forward, leaning backward, standing, sitting, sleeping, going up and down stairs, walking, vacuuming, pinching, gripping, driving, changing position, pushing, pulling, washing her hair, lifting, carrying, opening jars, tying her shoes, crossing her legs and having her hands over her head; essentially everything." (Tr. 368).  A physical examination revealed the following:

> Cranial nerves 2-12 are intact.  Reflexes are 2/4 for the biceps, brachioradialis, triceps, patellar, hamstring and Achilles reflexes. Sensation reveals some altered sensation but not in a specific dermatomal pattern.  Manual muscle test reveals symmetrical strength, though there is occasionally some give-away weakness. There is some disparity between manual muscle testing and functional strength. Spurling's sign[4] is negative. Adson's maneuver[5] is negative. Lasègue's[6] is negative. Patrick's maneuver[7] is negative. Abdomen was nontender.  There is no pain with reverse straight leg raise.  The number of trigger points was minimal.

(Tr. 370).

---

[4]  A positive Spurling's test suggests the presence of a cervical nerve root disorder.  Thomas W. Woodward, M.D., and Thomas M. Best, M.D., Ph.D., *The Painful Shoulder: Part I Clinical Evaluation*, American Family Physician, May 15, 2000, *available at*, http://www.aafp.org/afp/20000515/3079.html (last visited August 25, 2014).

[5]  Adson's test is employed to determine the presence of thoracic outlet syndrome.  J.E. Schmidt, *Schmidt's Attorneys' Dictionary of Medicine* A-115 (Matthew Bender) (1996).

[6]  Lasegue's sign is a sign which is present in several abnormal conditions, such as a disorder in the lower vertebrae of the spine, meningitis, and sciatica. J.E. Schmidt, *Schmidt's Attorneys' Dictionary of Medicine* L-42 (Matthew Bender) (1996).

[7]  Patrick's test is used to determine whether a patient suffers from arthritis of the hip joint.  This test is also referred to as Fabere's sign.  J.E. Schmidt, *Schmidt's Attorneys' Dictionary of Medicine* P-81 (Matthew Bender) (1996).

The doctor recommended that Plaintiff reduce her use of Vicodin and get "re-involved in her weightlifting." (Tr. 370).

On November 21, 2007, Plaintiff participated in EMG and nerve conduction studies of her right upper and left lower extremities. (Tr. 366-67). The results of these examinations were as follows:

> The upper extremity findings were not suggestive of a cervical radiculopathy, ulnar neuropathy or radial neuropathy but were consistent with a right median neuropathy. The lower extremity findings were not suggestive of a lumbosacral radiculopathy. There was a slight suggestion of a peripheral neuropathy based on prolonged conduction velocity as well as decreased amplitudes.

(Tr. 367).

On January 17, 2008, Plaintiff participated in an MRI examination of her cervical spine the results of which revealed "mild cervical degenerative changes." (Tr. 354). Treatment notes dated October 3, 2008, indicate that Plaintiff was presently taking Fentanyl and Vicodin which "does control her pain very well." (Tr. 409).

On December 29, 2008, Dr. Peter Vande Haar completed a report regarding Plaintiff's physical abilities. (Tr. 429-31). The doctor reported that Plaintiff could continuously sit for two hours, stand for 30 to 60 minutes, and walk for 30 minutes. (Tr. 429). The doctor reported that "during an 8-hour workday with normal break periods," Plaintiff could sit for one hour, stand for 30 minutes, walk for 30 minutes, and sit/stand for one hour. (Tr. 429). The doctor reported that Plaintiff could "occasionally" lift/carry 10 pounds, but was unable to lift/carry 20 pounds. (Tr. 429). The doctor reported that Plaintiff could "occasionally" perform grasping and manipulation activities with her left upper extremity, but could "never" perform such activities with her right upper extremity. (Tr. 430). The doctor reported that Plaintiff could "never" perform any pushing and

pulling activities with her right upper extremity, but could "occasionally" perform such activities with her left upper extremity. (Tr. 430).

On May 21, 2009, Plaintiff was examined by Dr. Vande Haar. (Tr. 405). Plaintiff reported that she was experiencing "severe pain in her left upper extremity" and that she "cannot extend her left shoulder." (Tr. 405). The doctor noted that Plaintiff "had a previous MRI and an EMG of her left upper extremities, which were normal." (Tr. 405). An examination revealed:

> She has extreme hyperesthesia overall her shoulder, left paraspinal scapular area and all of her arm. She cannot extend her arm without having extreme pain. Etiology of her pain is not certain.

(Tr. 405).

On October 13, 2009, Plaintiff was examined by Dr. Debra Alspector. (Tr. 400-01). Plaintiff reported that she was experiencing "chronic right neck, right arm numbness, weakness, and pain." (Tr. 400). An examination revealed the following:

> The patient is in no acute distress, but she is holding her right arm bend at 90 degrees at elbow over her abdomen. Neck: slightly decreased range of motion. The patient has no C-spine tenderness. It is tight over trapezius muscle bilaterally and tender. Range of motion at the right shoulder, can get it up to about horizontal. Strength is about 3/5 on the right versus 5/5 on the left. Upper extremities reflexes are 2+ and equal bilaterally. Sensation has apparently increased over the right upper extremity diffusely.

(Tr. 400).

On October 20, 2009, Dr. Alspector reported her concern that Plaintiff was attempting to obtain multiple refills of a single pain medication prescription. (Tr. 398-99). The doctor concluded that she "will not prescribe Lortab or similar medication" for Plaintiff any longer. (Tr. 398). On November 11, 2009, Dr. Alspector reported that Plaintiff had engaged in "early filling" of her pain medications. (Tr. 397). The doctor reported that she was "concerned that the

12

patient might have stocked all of her medications at home or perhaps misusing or diverting it." (Tr. 397). The doctor further stated that she "will not prescribe oral narcotics for this patient as I am concerned about possible misuse." (Tr. 397).

On November 23, 2009, Plaintiff participated in a bone density scan the results of which were "normal." (Tr. 381-82). On January 19, 2010, Dr. Abramson reported that Plaintiff's "conditions make employment impossible." (Tr. 425). Treatment notes dated May 5, 2010, however, indicate that Plaintiff "is generally doing well." (Tr. 390). On September 28, 2010, Plaintiff participated in an MRI examination of her lumbar spine the results of which revealed "mild lumbar degenerative changes" with "no central spinal canal stenosis or nerve root compression." (Tr. 459).

On October 20, 2010, Dr. Abramson instructed Plaintiff to perform "back strengthening and abdominal strengthening exercises." (Tr. 453). On October 30, 2010, Dr. Abramson reported that Plaintiff is "unable to work." (Tr. 426). On November 17, 2010, Dr. Abramson reported, however, that Plaintiff "is more physically active and working more." (Tr. 450).

On April 15, 2011, Dr. Abramson completed a report regarding Plaintiff's physical abilities. (Tr. 433-35). The doctor reported that Plaintiff could continuously sit for two hours, stand for 30 to 60 minutes, and walk for 30 minutes. (Tr. 433). The doctor reported that "during an 8-hour workday with normal break periods," Plaintiff could sit for one hour, stand for 30 minutes, walk for 30 minutes, and sit/stand for one hour. (Tr. 433). The doctor reported that Plaintiff could "occasionally" lift/carry 10 pounds, but could "never" lift/carry 20 pounds. (Tr. 433). The doctor reported that Plaintiff could "occasionally" perform grasping and manipulation activities with her left upper extremity, but could "never" perform such activities with her right upper extremity. (Tr. 433).

13

On May 9, 2011, Dr. Abramson reported that Plaintiff "has been narcotic dependent for some time," but "is doing reasonably well." (Tr. 438). On November 23, 2011, Plaintiff reported that "her pain level is 4/10." (Tr. 487). On December 6, 2011, Plaintiff participated in a bone density study the results of which were "normal." (Tr. 489-90).

On January 27, 2012, Dr. Abramson completed a report regarding Plaintiff's physical abilities. (Tr. 476-81). The doctor reported that Plaintiff can "never" lift or carry any amount of weight. (Tr. 476). The doctor reported that Plaintiff can continuously sit for one hour, stand for one hour, and walk for 20 to 30 minutes. (Tr. 477). The doctor reported that "in an 8 hour work day," Plaintiff can sit for two hours, stand for two hours, and walk for one hour. (Tr. 477). The doctor reported that Plaintiff can "never" perform reaching or pushing/pulling activities with either of her upper extremities. (Tr. 478). The doctor reported that Plaintiff can "never" balance, stoop, kneel, crouch, crawl, or climb stairs and ramps. (Tr. 479).

## ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[8] If the Commissioner can make a

---

[8]1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5.  If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be

dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528. While the burden of proof shifts to the Commissioner at step five of the sequential evaluation process, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffered from: (1) right upper extremity abnormalities and pain with use of the right upper extremity; (2) history of carpal tunnel syndrome releases of the right upper extremity in approximately 1995 and 2000; and (3) myofascial cervical spine disorder with right-sided pain, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 26-29).

---

performed (20 C.F.R. 404.1520(f)).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform light work subject to the following limitations: (1) she can only occasionally lift/carry 20 pounds, but can frequently lift/carry 10 pounds; (2) she can sit, stand, and walk six hours each during an 8-hour workday, without the use of an assistive device; (3) she cannot perform overhead reaching activities with her right upper extremity, but she can frequently use her right upper extremity for reaching in other directions, handling, fingering, feeling, and pushing or pulling; (4) she can continuously use her left upper extremity to perform these activities; (5) she can use her lower extremities for continuous operation of foot controls; (6) she can occasionally climb ramps and stairs, but cannot climb ladders, ropes, or scaffolds; (7) she can frequently balance, stoop, kneel, crouch, and crawl; (8) she cannot work around unprotected heights, vibrations, or moving mechanical parts; (9) she cannot continuously operate a motor vehicle; and (10) she cannot be continuously exposed to humidity, wetness, temperature extremes, dust, odors, fumes, or gases.  (Tr. 29-30).

The ALJ questioned a vocational expert who testified that if limited to the extent reflected by her RFC, Plaintiff retained the ability to perform her past relevant work as a customer service sales person and administrative assistant.  (Tr. 79).  The vocational expert also testified that there existed approximately 61,000 other jobs in the state of Michigan which Plaintiff could perform consistent with her RFC.  (Tr. 79-80).  The vocational expert further testified that if Plaintiff were further limited in that she could only use her right upper extremity only occasionally there still existed approximately 49,000 other jobs in the state of Michigan which she could perform.  (Tr. 80). Based on the vocational expert's testimony, the ALJ concluded that Plaintiff could perform her past relevant work and was, therefore, not entitled to disability benefits.

I.          **Plaintiff is Not Entitled to a Sentence Six Remand**

As part of her request to obtain review of the ALJ's decision, Plaintiff submitted to the Appeals Council additional evidence which was not presented to the ALJ.  (Tr. 1-7, 554-621). The Appeals Council received the evidence into the record and considered it before declining to review the ALJ's determination.  This Court, however, is precluded from considering such material. In *Cline v. Commissioner of Social Security*, 96 F.3d 146 (6th Cir. 1996), the Sixth Circuit indicated that where the Appeals Council considers new evidence that was not before the ALJ, but nonetheless declines to review the ALJ's determination, the district court cannot consider such evidence when adjudicating the claimant's appeal of the ALJ's determination.  *Id.* at 148; *see also*, *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007) (quoting *Cline*, 96 F.3d at 148).

If Plaintiff can demonstrate, however, that this evidence is new and material, and that good cause existed for not presenting it in the prior proceeding, the Court can remand the case for further proceedings during which this new evidence can be considered.  *Cline*, 96 F.3d at 148.  To satisfy the materiality requirement, Plaintiff must show that there exists a reasonable probability that the Commissioner would have reached a different result if presented with the new evidence. *Sizemore v. Secretary of Health and Human Serv's*, 865 F.2d 709, 711 (6th Cir. 1988).  Plaintiff bears the burden of making these showings.  *See Hollon ex rel. Hollon v. Commissioner of Social Security*, 447 F.3d 477, 483 (6th Cir. 2006).

In her initial brief, Plaintiff did not request a Sentence Six remand or otherwise address this issue.  In her reply brief, Plaintiff made mention of this issue, but failed to offer any meaningful argument or analysis as to how the aforementioned standard is satisfied.  Specifically,

17

Plaintiff asserted only that "all of that evidence clearly could not have been obtained before the hearing, as it was post-hearing medical evidence," thus the Court should "consider that evidence." (Dkt. #17 at Page ID#705).  Plaintiff's "argument" fails to satisfy either prong of the analysis.  The fact that the evidence in question was not procured until after the administrative hearing does not necessarily lead to the conclusion that the evidence could not have been obtained prior to the administrative hearing.  Moreover, Plaintiff has failed to advance any argument that the ALJ would have reached a different conclusion had he considered the evidence in question.  The burden to obtain a sentence six remand rests with Plaintiff who has failed to satisfy her burden in this regard.  The Court recommends, therefore, that Plaintiff is not entitled to a sentence six remand.

## II.    The ALJ's Assessment of the Medical Opinions is Supported by Substantial Evidence

As noted above, Dr. VandeHaar and Dr. Abramson offered various opinions regarding Plaintiff's functional abilities both concluding that Plaintiff was far more limited than recognized by the ALJ.  The ALJ afforded "little weight" to these particular opinions.  (Tr. 31-32).  Plaintiff asserts that she is entitled to relief because the ALJ improperly discounted the opinions from her treating physicians.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and his maladies generally possess significant insight into his medical condition.  *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).  An ALJ must, therefore, give controlling weight to the opinion of a treating source if: (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with the other substantial evidence in the case record."  *Gayheart v.*

18

*Commissioner of Social Security*, 710 F.3d 365, 375-76 (6th Cir. 2013) (quoting 20 C.F.R. §

404.1527).

   Such deference is appropriate, however, only where the particular opinion "is based

upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at

*2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232,

235 n.1 (6th Cir. 1987)).  The ALJ may reject the opinion of a treating physician where such is

unsupported by the medical record, merely states a conclusion, or is contradicted by substantial

medical evidence.  *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991

WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*,

839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284,

286-87 (6th Cir. 1994).

   If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ

must "give good reasons" for doing so.  *Gayheart*, 710 F.3d at 376.  Such reasons must be "supported

by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent

reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons

for that weight."  This requirement "ensures that the ALJ applies the treating physician rule and

permits meaningful review of the ALJ's application of the rule."   *Id.* (quoting *Wilson v.*

*Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004)).  Simply stating that the

physician's opinions "are not well-supported by any objective findings and are inconsistent with

other credible evidence" is, without more, too "ambiguous" to permit meaningful review of the ALJ's

assessment.  *Gayheart*, 710 F.3d at 376-77.

If the ALJ affords less than controlling weight to a treating physician's opinion, the ALJ must still determine the weight to be afforded such. *Id.* at 376. In doing so, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *Id.* (citing 20 C.F.R. § 404.1527). While the ALJ is not required to explicitly discuss each of these factors, the record must nevertheless reflect that the ALJ considered those factors relevant to his assessment. *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007).

Dr. Abramson opined that Plaintiff can "never" lift or carry any amount of weight and can only sit for two hours, stand for two hours, and walk for one hour during an 8-hour workday. Dr. Abramson also reported that Plaintiff can "never" balance, stoop, kneel, crouch, crawl, climb stairs and ramps, or perform reaching or pushing/pulling activities with either of her upper extremities. Dr. Vande Haar reported that "during an 8-hour workday with normal break periods," Plaintiff could sit for one hour, stand for 30 minutes, walk for 30 minutes, and sit/stand for one hour. The doctor reported that Plaintiff could "occasionally" lift/carry 10 pounds, but was unable to lift/carry 20 pounds.

The ALJ discounted these opinions, concluding that "the medical source statements are not well supported by the medical findings of record. Indeed, they preclude the claimant from performing many activities without giving supporting findings." (Tr. 31). As detailed above, while the medical evidence reveals that Plaintiff experiences certain physical limitations such are adequately accounted for in the ALJ's RFC determination. Moreover, the opinions expressed by Dr.

Abramson and Dr. Vande Haar are not supported by the record. In sum, the ALJ's conclusion to afford less than controlling weight to the opinions in question is supported by substantial evidence.

### III.          Plaintiff is not Disabled Pursuant to the Grids

The medical-vocational guidelines, also known as the "grids," consider four factors relevant to a particular claimant's employability: (1) residual functional capacity, (2) age, (3) education, and (4) work experience. 20 C.F.R., Part 404, Subpart P, Appendix 2. Social Security regulations provide that "[w]here the findings of fact made with respect to a particular individual's vocational factors and residual functional capacity coincide with all the criteria of a particular rule, the rule directs a conclusion as to whether the individual is or is not disabled." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00. In other words, a claimant may be awarded benefits if she satisfies the requirements of one of the particular rules correlating to a finding of disability.

When utilizing the grids, the claimant's age as of the time of the ALJ's decision governs. *See Harrison v. Commissioner of Social Security*, 2014 WL 1232685 at *4 (W.D. Mich., Mar. 25, 2014) (citing *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 780 (6th Cir. 1987)). The ALJ rendered his decision in this matter only weeks before Plaintiff's fiftieth birthday. Pursuant to the grids, a claimant 49 years of age is considered to be a "younger individual," whereas a claimant 50 years of age is considered to be "closely approaching advanced age." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201.00(g)-(h). The ALJ found Plaintiff to be "a younger individual" rather than somebody closely approaching advanced age. (Tr. 33). Plaintiff asserts that, under the circumstances, the ALJ was obligated to explain why he did not consider her to be in the more favorable age category. Plaintiff further asserts that had the ALJ considered her to

21

be closely approaching advanced age, a finding that she is disabled would be mandated by Rule 201.03 of the grids.

While the ALJ did not rely on the grids in making his decision, he concluded that Plaintiff fit within the framework of Rule 202.21, the provision for younger claimants, with a high school education, whose prior work experience is "skilled or semi-skilled," but is not transferable to jobs within her RFC.  20 C.F.R., Part 404, Subpart P, Appendix 2, Rule 202.21.  Pursuant to this particular Rule, Plaintiff is considered "not disabled."  *Id.*  However, even if Plaintiff were considered to be "closely approaching advanced age," she would still be considered "not disabled." 20 C.F.R., Part 404, Subpart P, Appendix 2, Rule 202.14.  Thus, the ALJ's failure to consider whether Plaintiff should have been considered to be closely approaching advanced age is harmless. *See, e.g., See Russell v. Commissioner of Social Security*, 20 F. Supp.2d 1133, 1135 (W.D. Mich. 1998); *Eljack v. Astrue*, 2012 WL 2476405 at *4 (N.D. Ala., June 22, 2012); *Vargiamis v. Astrue*, 2007 WL 3283649 at *3 (E.D. Pa., Nov. 5, 2007).

Plaintiff's argument that she should be found disabled pursuant to Rule 201.03 fails for several reasons.  First, this particular Rule applies to claimants limited to sedentary work.  The ALJ determined, however, that Plaintiff can perform a wide range of light work.  Furthermore, Rule 201.03 applies to individuals of "advanced age" (age 55 and over) who possess a limited education. Plaintiff was not of advanced age when the ALJ rendered his decision and, moreover, possesses a high school education.  Thus, Rule 201.03 is not applicable.  Accordingly, this argument is rejected.

**IV.**         **The ALJ Properly Relied on the Vocational Expert's Testimony**

As previously noted, in determining that Plaintiff retained the ability to perform her past relevant work, the ALJ relied upon the testimony of a vocational expert. Plaintiff asserts that she is entitled to relief because the hypothetical question to which he responded did not accurately describe her limitations.

While the ALJ may satisfy his burden through the use of hypothetical questions posed to a vocational expert, such hypothetical questions must accurately portray the claimant's physical and mental impairments. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150 (6th Cir. 1996). The hypothetical question which the ALJ posed to the vocational expert simply asked whether there existed jobs which an individual could perform consistent with Plaintiff's RFC, to which the vocational expert indicated that Plaintiff would be able to perform her past relevant work. The ALJ's RFC determination is supported by substantial evidence and there was nothing improper or incomplete about the hypothetical questions the ALJ posed to the vocational expert. The Court concludes, therefore, that the ALJ properly relied upon the vocational expert's testimony.

## <u>CONCLUSION</u>

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence. Accordingly, it is recommended that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within such time waives the right to appeal the District Court's order. *See*

*Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date:  September 5, 2014                                   /s/ Ellen S. Carmody
ELLEN S. CARMODY
U.S. Magistrate Judge

24